IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| **J.M.** *by her next friend Jessica Nunley,*[1] | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Action No. 2:15-cv-475** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner,** | : | |
| **Social Security Administration,** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff Jessica Nunley's ("Ms. Nunley") complaint

on behalf of her minor daughter, J.M., filed pursuant to 42 U.S.C. § 405(g) seeking judicial

review of the final decision of the Defendant, the Acting Commissioner of the Social Security

Administration ("Acting Commissioner"), denying Ms. Nunley's claim for Disability Insurance

Benefits ("DIB") under the Social Security Act. Both parties have filed motions for summary

judgment, ECF Nos. 12 and 13, which are now ready for recommended disposition. This action

was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to

28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of

Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain

Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes

this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and

Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms.

---

[1] Although Ms. Nunley filed this action as Jessica Nicole Burks, she filed a notice of name change on December 19, 2016. ECF No. 22. In addition, Ms. Nunley filed her complaint under "J.M. by his next friend." ECF No. 1. However, since J.M. is female, the Court has changed the caption appropriately.

Nunley's Motion for Summary Judgment, ECF No. 12, be **DENIED**; the Defendant's Motion for Summary Judgment, ECF No. 13, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE.**

## I. PROCEDURAL BACKGROUND

On May 23, 2012, Ms. Nunley initially filed J.M.'s application for DIB, alleging disability due to developmental delay, expressive language disorder, and pica with an onset date of August 1, 2009. R. 156-57.[2] Her application was initially denied on November 9, 2012, *id.* at 90-94, and again denied upon reconsideration on July 2, 2013, *id.* at 97-105. Ms. Nunley then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on March 26, 2014. *Id.* at 38-66. The ALJ, Judge Alfred J. Costanzo, issued a decision denying Ms. Nunley's DIB application for J.M. on May 5, 2014. *Id.* at 10-30. On May 5, 2014, Ms. Nunley filed a request with the Appeals Council to reconsider Judge Costanzo's decision. *Id.* at 1. On August 28, 2015, the Appeals Council denied Ms. Nunley's request for review because the ALJ's decision was supported by substantial evidence and Ms. Nunley's claims did not warrant review, making the ALJ's decision the Commissioner's final decision. *Id.* at 1-6.

Having exhausted her administrative remedies, Ms. Nunley filed the instant complaint for judicial review of the Acting Commissioner's decision on October 29, 2015. ECF No. 3. The Acting Commissioner filed an Answer on December 30, 2015. ECF No. 8. The matter was referred to the undersigned U.S. Magistrate Judge on January 6, 2016. ECF No. 10. Ms. Nunley filed her Motion for Summary Judgment on February 11, 2016, ECF No. 12, and the Acting Commissioner filed a Cross-Motion for Summary Judgment and a Memorandum in Support on March 11, 2016, ECF Nos. 13 and 14. On May 6, 2016, Ms. Nunley filed a reply brief in

---

[2] "R." refers to the certified administrative record that was filed under seal on December 30, 2015, pursuant to Local Civil Rules 5(B) and 7(C)(1).

support of her own motion for summary judgment and in opposition to the Acting Commissioner's motion. ECF No. 19.

## II. RELEVANT FACTUAL BACKGROUND

In her application, Ms. Nunley alleged J.M.'s disability onset date was August 1, 2009. R. 156-57. J.M. was in kindergarten at the time of filing and had undergone occupational and speech therapy for her developmental delay, expressive language disorder, and pica. *Id.* at 157, 159. At the administrative hearing on March 26, 2014, Ms. Nunley was the sole witness, *Id.* at 39, where she provided the following testimony:

Ms. Nunley testified that J.M. was in the first grade and lived with her in an apartment. *Id.* at 42-44. J.M. has a sister in kindergarten who does not live with them and Ms. Nunley has never been married and does not receive child support. *Id.* at 43. J.M. had an academic Individualized Education Program ("IEP") to help with her difficulties in writing, science, math, and reading comprehension. *Id.* at 45-46. Ms. Nunley said J.M. received mostly Ds and Cs in school, and that J.M.'s school would allow her to decide whether her daughter would repeat the first grade. *Id.* In addition, J.M. had good attendance at school and did not have any behavior problems. *Id.* at 45, 47. She had friends in school and in her neighborhood, and she also participated in Girl Scouts, which she enjoyed. *Id.* at 47.

Moreover, Ms. Nunley testified J.M.'s biggest difficulty was handling her frustration. *Id.* at 48-50. She also said J.M. has an expressive speech disorder that inhibits her from answering open-ended questions, retelling stories, and being understood by people not familiar with her. *Id.* at 51-52. Ms. Nunley stated J.M. does not take any medication and has not experienced any health problems related to her sickle cell. *Id.* at 52-54. J.M. received occupational and speech therapy in school and additional speech therapy once a week outside of school. *Id.* at 57. J.M.

3

did not suffer from any physical problems and can run, walk, feed herself, cut with scissors, bathe, and dress herself. *Id.* at 57-59. J.M. experienced some incontinence problems while at school, but her IEP allowed her to use the bathroom whenever she needed. *Id.* at 61.

According to J.M.'s school records, an IEP from May 31, 2012, revealed that she had mastered 50% of her IEP goals, could speak in complete sentences, identify colors, letters, and numbers up to ten, recognize family members, and follow the classroom routine. *Id.* at 192-93. The IEP stated she had difficulty following multiple step directions and "answering yes/no and "wh[-]" questions on a consistent basis." *Id.* at 193. Additionally, the IEP provided J.M.'s "overall language skills have improved," but that she "continues to have receptive and expressive language delays in the areas of vocabulary, responding to question, sentence structure, and sequencing skills" and "also delays in the area of pragmatic language skills." *Id.* at 194. However, J.M. does not have difficulty with her social/emotional functioning, motor and/or daily living skills, work habits/ work adjustment skills, home/independent living, or community participation. *Id.* Ultimately, the IEP concluded J.M. has a sensory integration disorder and that she would be placed in an inclusion kindergarten classroom and receive 600 minutes of Specially Designated Instruction and sixty minutes of speech therapy every week. *Id.* at 195.

J.M.'s special education teacher and her kindergarten teacher completed a teacher questionnaire on April 9, 2013. *Id.* at 182-89. They noted that in the category of acquiring and using information, she had serious problems in eight of the ten indicators and obvious problems in the other two. *Id.* at 183. In the category of attending and completing tasks, J.M. had serious problems in seven of the thirteen indicators, obvious problems in two, slight problems in two, and no problems in two. *Id.* at 184. Further, in the category of interacting and relating with others, J.M. demonstrated obvious problems in four of the thirteen indicators, slight problems in

4

one, and no problems in the remaining seven. *Id.* at 185. The teachers indicated that they could understand almost all of J.M.'s speech "after repetition and/or rephrasing." *Id.* at 186. In the category of moving about and manipulating objects, they noted J.M. had obvious problems in three of the seven categories, slight problems in two of them, and no problems in the other two. *Id.* The teachers wrote that J.M. "usually manages well, but seems to fall/trip more than average" and that she receives occupational therapy for handwriting and cutting. *Id.* In the category of caring for herself, the teachers said J.M. presented serious problems in four of the ten indicators, obvious problems in two, slight problems in one, and no problems in three. *Id.* at 187. In the section for medical conditions, the teachers wrote that J.M. has pica, eczema, and sickle cell anemia but they have "not impacted function in the classroom." *Id.* at 188.

On January 14, 2014, J.M. underwent an IEP classification assessment. *Id.* at 206. She was in the 37th percentile for nonverbal cognitive ability, the 82nd percentile for academic skills, the 77th percentile for brief reading skills, the 65th percentile for math calculation skills, and the 70th percentile for brief writing skills. *Id.* Overall, her scores were considered in the "range from high average to above average." *Id.* The IEP report stated J.M. had a "supportive home environment," but that she "demonstrates severe language difficulties which limit her communication" and "shows characteristics of Autism." *Id.* at 207.

J.M.'s first grade teacher completed a teacher questionnaire on February 7, 2014. *Id.* at 216-27. The teacher wrote that J.M. was on grade level for reading, but below grade level for math and writing. *Id.* at 216. The teacher noted that in the category of acquiring and using information, J.M. had very serious problems in three of the ten indicators, serious problems in five of them, and slight problems in two. *Id.* at 217. In the category of attending and completing tasks, J.M. had very serious problems in six of the thirteen indicators, serious problems in one,

5

obvious problems in three, and slight problems in three. *Id.* at 218. In the category of interacting and relating with others, J.M. demonstrated serious problems in four of the thirteen indicators, obvious problems in three, and slight problems in six. *Id.* at 219. J.M.'s teacher said she could not understand more than half of J.M.'s speech after repetition and/or rephrasing. *Id.* at 220. In the category of moving about and manipulating objects, she noted J.M. had obvious problems in two of the seven categories and slight problems in five of them. *Id.* In the category of caring for herself, J.M.'s teacher said J.M. presented serious problems in six of the ten indicators, obvious problems in one, and slight problems in three. *Id.* at 221. In the final section for medical conditions, J.M.'s teacher noted J.M. "experienced incontinence throughout the first semester of school, but has not had any problems lately." *Id.* at 222.

J.M.'s update to her IEP placement on February 27, 2014, stated that she is "using a functional pencil grasp when writing" and "has made good progress with letter and number formation." *Id.* at 235. J.M. "is able to produce legible work with [minimal] verbal cues for spacing and line orientation," but she "often requires moderate redirection throughout a treatment session to remain focused on the task and this affects her written work." *Id.* An instructional testing accommodation from the same date explained that J.M. "requires the use of a study carrel during testing to reduce stimuli and distractibility" and that she receives tests in a small group and is allowed to take "reasonable breaks...to minimize fatigue." *Id.* at 236. An IEP Team Meeting Summary on March 11, 2014, stated that J.M. was "on grade level and does not require goals and objectives in academic areas," but that she would receive sixty minutes per week of speech services and 120 minutes of occupational therapy services. *Id.* at 237.

Furthermore, J.M.'s medical records date back to June 28, 2012, when she underwent an occupational therapy evaluation that showed she "performed below age level across all testing"

and that "[d]efinite issues were noted with (1) sensory processing...(2) sensory modulation...and (3) behavior and emotional responses." *Id.* at 259. After occupational therapy from July 2012 to September 2012, *Id.* at 263-343, J.M. "made great progress across skill areas with improvement on both assessments." *Id.* at 342. J.M. "benefit[ed] well from modeling and appears to be a quick learner. No sensory deficits impacting function or performance at this time." *Id.*

On August 9, 2012, J.M. went through a speech language assessment after "parental concerns with expressive language" such as not speaking much at school or around new people. *Id.* at 280. The speech therapist concluded she had a "moderate-severe receptive and expressive language disorder" due to her "difficulty understanding concepts, age appropriate grammatical structures (pronouns, possessives and plurals) and negation." *Id.* at 282. J.M. was recommended to undergo speech therapy services for one hour per week for a year. *Id.* After six months of speech therapy, on February 28, 2013, J.M.'s progress note stated that that her "goals [were] achieved for use of 4-5 word utterances and answering yes/no questions," and that she had made "[i]mprovements with present progressive verbs." *Id.* at 422. J.M.'s speech therapy ran until August 12, 2013. *Id.* at 423-65.

J.M. presented for a social/behavioral evaluation on January 15, 2014. *Id.* at 471. The doctor found she "was able to focus for brief periods up to two-to-three minutes with one-to-one instruction" and "attended to examiner questions and instructions with intrusive prompting." *Id.* During the assessment, J.M. "was able to communicate using simple phrases, gestures, and physical movement" and "had a good understanding of 'no,' and 'yes' responses." *Id.* The doctor administered the Autism-Diagnostic Observation Schedule-Second Edition (ADOS-2) and found "[t]he results of this instrument indicate that [J.M.] shows behaviors consistent with the criteria for the autism spectrum cut-off score...with a low level of evidence of autism related

7

symptoms." *Id.* at 472. Further, the doctor gave recommendations for J.M.'s learning style as well as accommodations for maintaining her attention in the classroom. *Id.* at 473.

J.M.'s treating physician wrote a letter on February 13, 2014, that stated he "met [J.M.] at age 18 months and at that time she was noted to have a language delay." *Id.* at 468. The physician noted that she had genetic testing at her three year visit that revealed she might have an autism spectrum disorder, but that he believed she needed to repeat the ADOS testing. *Id.* J.M.'s records from a doctor's visit on May 5, 2014, indicated she had repeated the ADOS testing and her results were "consistent with a diagnosis of autism spectrum disorder." *Id.* at 469. The doctor noted that J.M. "could stay in the inclusion classroom next year," but that she "may also benefit from a smaller self-contained classroom for special education." *Id.*

Lastly, J.M. underwent a psychological evaluation on November 1, 2012, at the request of the state agency. *Id.* at 302-04. The evaluation revealed that she had "no obvious motor impairment...could sit, stand, walk, and maintain balance...was flexible...Gait and posture were unremarkable...had an initially high activity level, but then was within normal limits after she calmed down...had no tics, mannerisms, or atypical motor behaviors as typically conceptualized...engaged in broadly repetitive gestures...[and] had some exaggerated physical gestures." *Id.* at 303. J.M. presented with "low average overall cognitive ability with better nonverbal than verbal skills" and "some features consistent with a mild pervasive developmental disorder," but that there was "improvement in her functioning level over time." *Id.* at 304.

Three state agency experts reviewed J.M.'s records on November 8, 2012, and found that although J.M. had "marked difficulties with speech, records show that she is continuing to improve all of the time" and that she "receives special education services for her speech and language impairment." *Id.* at 74. Additionally, they found that even though J.M. had a pervasive

8

developmental delay, "her limitations…are not so severe as to be disabling." *Id.* Ultimately, the experts concluded J.M.'s "condition results in some limitations in the ability to function, but those limitations are not severe enough to be considered disabling" because it "does not cause marked and severe functional limitations." *Id.*

Ms. Nunley requested reconsideration of the state agency experts' decision, and subsequently three new state experts were selected to review J.M.'s records between June 26, 2013, and July 1, 2013. *Id.* at 82-88. The experts concluded J.M.'s "condition results in some limitation in the ability to function, but those limitations are not severe enough to be considered disabling" because "her condition does not cause marked and severe functional limitations." *Id.* at 86. The experts noted she "has a history of treatment for her conditions" and although she "has some difficulties with her speech, she is still able to communicate with others and most of her speech can be understood without much difficulty." *Id.* Moreover, her pervasive developmental delay presents some limitations, but "they are not so severe as to be disabling" as "with continued treatment her condition should continue to improve." *Id.*

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a three-step sequential analysis of childhood disability claims for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ "follow[s] a set order" to determine whether a child has a disability, by determining whether the child: (1) is working or doing substantial gainful activity

9

since the impairment; (2) has a physical or mental impairment or combination of impairments that is severe; and (3) if the impairment "meets, medically equals, or functionally equals" a listed disability. 20 C.F.R. § 416.924(a).

An impairment of a child age three to eighteen meets or medically equals a listed impairment, if at least two of the following are present:

a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P., app.1 § 112.02(B)(1)(d)(2).

Determining if a child functionally equals the listing under the third step requires evaluation of six domains of the child's limitation with: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for themselves; and (6) their health and physical well-being. 20 C.F.R. § 416.926a(b)(1). The ALJ can find an impairment functionally equals a listed disability if the child has an "extreme" limitation in one of the six domains or two "marked" limitations. 20 C.F.R. §416.92a(a). The ALJ can determine a limitation is "extreme" if the child's impairment "interferes very seriously with [their] ability to independently initiate, sustain, or

complete activities." 20 C.F.R. § 416.926a(e)(3). Likewise, the ALJ can find a limitation is "marked" if the child's impairment "interferes seriously with [their] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that J.M. met the first two steps because she has not engaged in substantial activity since applying for DIB and her speech-language developmental delay is a severe impairment. R. 16. However, the ALJ concluded that J.M. did not meet step three, and is thus not disabled, because she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" and she "does not have an impairment or combination of impairments that functionally equals the severity of the listings." *Id.* at 16-17.

Regarding the conclusion that J.M. did not meet or medically equal the severity of a listed impairment, the ALJ gave "significant weight to the State agency medical consultants' opinions." *Id.* at 16. The ALJ found that J.M. did not have "at least two of the following: marked impairment in age-appropriate cognitive/communicative function; marked impairment in age-appropriate social functioning; marked impairment in age-appropriate personal functioning; or marked difficulties in maintaining concentration, persistence or pace." *Id.* The ALJ noted that although J.M. "had low average overall cognitive ability" and "problems with inattention and distractibility," "she had "average nonverbal cognitive ability and very high academic skills," "friends in school and out of school," "does not appear to have significant behavioral problems," and "is on grade level academically." *Id.* at 16-17.

The ALJ found J.M. did not functionally equal the severity of a listed impairment even though J.M.'s "medically determinable impairments could reasonably be expected to produce the

alleged symptoms," "the statements concerning the intensity, persistence, and limiting effects of these symptoms are only partially credible." *Id.* at 18. Furthermore, the ALJ acknowledged that J.M. had a language disorder dating back to when she was eighteen months old and that her the questionnaires from her kindergarten and first grade teachers revealed serious and obvious problems. *Id.* Ultimately, the ALJ did not find these concerns to support a "marked" finding in any of the six domains because in November 2012, J.M. was doing fine in school, and despite her diagnoses of a mild pervasive developmental disorder and a mild level of autism spectrum disorder, she was reading at grade level. *Id.* at 18-19. The ALJ gave "relatively little weight to the teacher questionnaires...as they seem to overstate [J.M.'s] functional limitations" since she has "good speech intelligibility for both familiar and novel listeners, normal voice/fluency, and good articulation phonology, with some articulation errors" as well as the fact "[s]he continues to receive occupational therapy, but has made good progress, and although she reportedly has problems maintaining attention, she is on grade level academically." *Id.* at 19.

The ALJ also explained why he did not find that J.M. had "marked" limitation in any of the six domains. *Id.* at 19-27. First, the ALJ concluded J.M. had "less than marked limitation in acquiring and using information" because of the improvements she had made with speech therapy, her ability to follow directions, her good speech intelligibility, and that she is doing well academically. *Id.* at 20-21. The ALJ stated that the fact J.M. was reading at grade level was evidence against a "marked" limitation in this category "[c]onsidering the importance of reading in the overall educational process." *Id.* at 19. Secondly, the ALJ found that J.M.'s limitation with attending and completing tasks was less than "marked" because she is not taking any medication nor has she been diagnosed with attention-deficit disorder. *Id.* at 21-22. She "also likes routines and functions well with them, completes activities that she enjoys, and is on grade

level despite her reported problems. *Id.* at 22. The ALJ found J.M. has less than "marked" limitation in the third category of interacting and relating with others because "she has friends in school and outside of school. *Id.* at 22-23. This, along with the fact that she also "interacts with others in Girl Scouts" and enjoys the activities, counteracted the teacher questionnaires. *Id.* at 22-23.

Fourth, the ALJ decided J.M. did not have any limitation in moving about and manipulating objects based on her November 2012 examination, her most recent IEP, and her mother's testimony at the hearing. *Id.* at 23-25. Fifth, the ALJ concluded J.M. did not have "marked" limitation in the ability to care for herself given her November 2012 examination and her mother's testimony. *Id.* at 25-26. Lastly, the ALJ found that J.M. did not have any limitation in health and physical well-being as her kindergarten teacher said that her pica, eczema, and sickle cell did not impact her ability in the classroom and her mother testified she did not have any health problems related to the sickle cell. *Id.* at 26-27.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or

substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A. Ms. Nunley Can Bring a Claim on Behalf of J.M.

Generally, non-attorney parents are barred from representing their children, *pro se*, in federal court. In *Myers v. Loundoun County Public Schools*, the Fourth Circuit "join[ed] the vast majority of . . . [her] sister courts in holding that non-attorney parents generally may not litigate the claims of their minor children." 418 F.3d 395, 401 (4th Cir. 2005). In so ruling, the Fourth Circuit reasoned that the purpose of the rule is to protect (1) the rights of litigants from incompetent representation, and (2) the rights of the court from ". . . poorly drafted, inarticulate, and vexatious claims." *Id.* at 400.

Various circuit courts have, however, developed an exception to this rule for social security litigation. For instance, in *Machadio v. Apfel*, the Second Circuit held that social security litigation presents a special circumstance requiring an exception to the established rule. 276 F.3d. 103, 107 (2d Cir. 2002). The Court held that a competent guardian may litigate, *pro se*, on behalf of her minor children in federal court if the civil action is an appeal from a denial of social security benefits because the interests of non-attorney parents and minor children are sufficiently entwined to insure proper *pro se* representation. *Id.* at 106-07. Additionally, the

Court noted that 20 C.F.R. § 406 authorizes non-attorneys to represent claimants before the Commissioner. *Id.* at 107. The Court in its holding articulated that non-attorney parents may litigate, *pro se*, on behalf of their minor children so long as the parent has "a sufficient interest in the case and meets basic standards of competence." *Id.*

The Fifth Circuit had recognized a similar exception, holding that non-attorney parents could represent their minor children in appeals for social security benefits. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). In so deciding, the Fifth Circuit found that

> . . . minors in SSI appeals can be adequately protected without legal counsel [since] the proceedings essentially involve the review of an administrative record. We are persuaded that prohibiting non-attorney parents from proceeding pro se in appeals from administrative SSI decisions, on behalf of a minor child, would jeopardize seriously the child's statutory right to judicial review under [20 C.F.R.] § 405(g). We conclude that policy considerations . . . compel our holding that a non-attorney parent be permitted to sustain a pro se action on behalf of a minor child in SSI appeals.

*Id.* The Tenth Circuit Court was "persuaded by the analyses [of the foregoing cases] and agree[d] with the Fifth Circuit 'that prohibiting non-attorney parents from proceeding pro se in appeals from administrative [social security] decisions, on behalf of a minor child, would jeopardize seriously the child's statutory right to judicial review.'" *Adams v. Astrue*, 659 F.3d 1297, 1301 (10th Cir. 2011).

The Fourth Circuit concurred with the Second, Fifth, and Tenth Circuits. *Lee v. Commissioner of the Social Security Administration*. No. 15-2402, 2016 WL 2893951, at *1 n.1 (*per curiam*) (4th Cir. 2016). In *Lee*, the Fourth Circuit articulated in a footnote that "[a]lthough we previously . . . recognized that 'non-attorney parents generally may not litigate the claims of their minor children' . . . we conclude that Lee is authorized to litigate KLJ's claims in the circumstances presented by this appeal from the administrative denial of SSI benefits." *Id.*

(citing *Adams*, 659 F.3d at 1301; *Machadio*, 276 F.3d at 107; and *Harris*, 209 F.3d at 417). Therefore, Ms. Nunley can bring the instant action on behalf of J.M. even though she is a non-attorney parent under this exception.

**B. The ALJ's Determination that J.M.'s Impairments Did Not Meet or Medically Equal a Listed Impairment is Supported by Substantial Evidence in the Record.**

The ALJ's conclusion that J.M.'s impairment met at least two of the four categories is supported by sufficient evidence in the record. First, the record buttresses the finding that J.M. did not have marked impairment in age-appropriate cognitive/communicative function. Even though J.M.'s November 2012 cognitive testing said she has "low average overall cognitive ability" and "better nonverbal than verbal skills," the ALJ's finding was supported by the fact that J.M. had "average nonverbal cognitive ability and very high academic skills." *Id.* at 16, 206, 302-04. J.M.'s most recent IEP stated that "has made good progress with letter and number formation" as well as that she was "on grade level and does not require goals and objectives in academic areas." *Id.* at 235-37. The ALJ noted that he gave "significant weight" to the state agency's opinions, *Id.* at 16, and the state psychological evaluation noted that there was "improvement in her functioning level over time," *Id.* at 304.

Additionally, the record reinforces the finding that J.M. did not have either "marked" impairment in age-appropriate social functioning or "marked" impairment in age-appropriate personal functioning. Ms. Nunley testified that J.M. has "friends in school and out of school" and enjoys participating in Girl Scouts. *Id.* at 47. Although Ms. Nunley stated J.M. does have difficulties handling her frustration, she also testified that J.M. does not have significant behavioral problems at school. *Id.* at 45, 47, 48-50. Lastly, the ALJ's finding that J.M. did not have marked difficulties in maintaining concentration, persistence or pace is supported by

16

evidence in the record despite her "problems with inattention and distractibility," because she "is

on grade level academically" as supported by her most recent IEP and the state agency's experts.

*Id.* at 16-17, 206, 235-37.[3]

## C. The ALJ's Determination that J.M.'s Impairments Did Not Functionally Equal a Listed Impairment is Supported by Substantial Evidence in the Record.

Likewise, the ALJ's conclusion that J.M.'s impairments did not functionally equal a

listed impairment is reinforced by substantial evidence in the record to demonstrate that she does

not have a "marked" limitation in any of the six domains. In order for the ALJ to find an

impairment functionally equals a listed disability, the child must have an "extreme" limitation in

one of the six domains or two "marked" limitations. 20 C.F.R. §416.92a(a). The ALJ had

sufficient evidence in the record to find that J.M. had less than a "marked" limitation in four of

the domains and no limitations in the other two domains.

The record supports the finding that J.M. had less than a "marked" limitation in the first

domain of acquiring and using information. J.M.'s first IEP showed that she had mastered 50%

of her IEP goals, could speak in complete sentences, identify colors, letters, and numbers up to

ten, recognize family members, and follow the classroom routine. *Id.* at 192-93. She also made

improvements after six months of speech therapy with the "use of 4-5 word utterances and

answering yes/no questions" and "with present progressive verbs." *Id.* at 422. Finally, her

academic level also demonstrates she can acquire and use information. J.M.'s IEP classification

assessment scores were in the "range from high average to above average," *Id.* at 206, and her

---

[3] The ALJ also determined that "[t]here is no evidence that [J.M.'s] speech/language delay medically equals any listing, such as Listing 2.09," R. 17, for an "inability to produce speech that can be heard, understood, or sustained." 20 C.F.R. Pt. 404, Subpt. P., app. 1 § 2.09. This finding is also supported by substantial evidence in the record including that J.M.'s kindergarten teacher understood nearly all of her speech, R. 186, her first grade teacher understood about half of her speech, *Id.* 220, and that the state experts found that "most of her speech can be understood without much difficulty." *Id.* at 86.

first grade teacher's questionnaire said she was reading at grade level, *Id.* at 216. J.M.'s most recent IEP stated she "has made good progress with letter and number formation" and that she was "on grade level and does not require goals and objectives in academic areas." *Id.* at 235-37.

In addition, there is sufficient evidence to support the ALJ's finding for the second domain that J.M.'s limitation with attending and completing tasks was less than "marked." Ms. Nunley testified that J.M. is not taking any medication nor has she been diagnosed with attention-deficit disorder. *Id.* at 52-54; 222. Moreover, J.M.'s first IEP said that she had "mastered" following the classroom routine and completing the tasks associated with it. *Id.* at 192-93. Most importantly, J.M.'s ability to stay on grade level demonstrates that she can attend and complete tasks associated with her education. *Id.* at 206, 216, 235-37.

Regarding the third domain, the record bolsters the ALJ's finding that J.M. has less than "marked" limitation in the category of interacting and relating with others. Ms. Nunley testified that J.M. has "friends in school and out of school" and enjoys participating in Girl Scouts. *Id.* at 47. Although Ms. Nunley stated J.M. has difficulties handling her frustration, she also said that J.M. does not have significant behavioral problems at school that would affect her ability to interact and relate with others. *Id.* at 45, 47, 48-50. Ms. Nunley's testimony is further supported by her first IEP that said J.M. "does not have difficulty with her social/emotional functioning." *Id.* at 194.

The record supports the finding that J.M. does not have any limitation in the fourth domain of moving about and manipulating objects. Her psychological evaluation on November 1, 2012, stated that she had no "obvious motor impairment," "could sit, stand, walk, and maintain balance," and "had no tics, mannerisms, or atypical motor behaviors as typically conceptualized." *Id.* at 302-04. Likewise, J.M.'s first IEP said J.M. "does not have difficulty

18

with her... motor and/or daily living skills," *Id.* 194, and the update to her IEP placement on February 27, 2014, stated that she is "using a functional pencil grasp when writing" and "is able to produce legible work with [minimal] verbal cues for spacing and line orientation." *Id.* at 235. Ms. Nunley even testified that J.M. did not suffer from any physical problems and could run, walk, feed herself, cut with scissors, bathe, and dress herself. *Id.* at 57-59. J.M. had difficulties with writing and cutting, *Id.* at 186, but has received occupational therapy services for them and has "made great progress across skill areas with improvement on both assessments." *Id.* at 342.

Furthermore, the ALJ's conclusion that J.M. did not have "marked" limitation in the fifth domain of the ability to care for herself is supported by the record. As mentioned with the fourth domain, J.M.'s psychological evaluation revealed that she did not have motor impairments that would prohibit her from taking care of herself and Ms. Nunley testified that J.M. can feed, bathe, and dress herself. *Id.* at 57-59; 302-04. Although Ms. Nunley stated at the hearing that J.M. had some incontinence problems, she conceded that her IEP allowed her to use the bathroom whenever she needed, *Id.* at 61, and J.M.'s first grade teacher noted in her questionnaire that J.M.'s teacher noted that J.M. "experienced incontinence throughout the first semester of school, but has not had any problems lately." *Id.* at 222.

Finally, there is sufficient evidence to support the ALJ's finding for the sixth domain that J.M. does not have any limitation in health and physical well-being. J.M.'s kindergarten teacher stated J.M.'s pica, eczema, and sickle cell have "not impacted function in the classroom." *Id.* at 188. Ms. Nunley also stated that J.M. does not take any medication and has not experienced any health problems related to her sickle cell. *Id.* at 52-54. Therefore, there was sufficient evidence in the record for the ALJ to find that J.M. does not have any limitation regarding her health and physical well-being.

19

## VI.  RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Nunley's Motion for Summary Judgment, ECF No. 12, be **DENIED**; the Defendant's Motion for Summary Judgment, ECF No. 13, be **GRANTED**; and the final decision of the Acting Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII.  REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1.  Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d).  A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2.  A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made.  The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
December 22, 2016