

FILED

FEB 13 2017

CLERK, US DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

J.M. by her next friend Jessica Nunley,

     Plaintiff,

     v.                          CIVIL NO. 2:15CV475

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration,

     Defendant.

## ORDER

This matter comes before the Court by Jessica Nunley's ("Plaintiff") Objection, ECF No. 26, on behalf of her minor daughter, J.M., to Magistrate Judge Lawrence R. Leonard's Report and Recommendation ("R&R"), ECF No. 23. For the reasons stated herein, the Court: (1) **ACCEPTS** the R&R, ECF No. 23; (2) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 12; (3) **GRANTS** the Acting Commissioner of the Social Security Administration's ("Defendant")[1] Motion for Summary Judgment, ECF No. 13; and (4) **AFFIRMS** the final decision of the Defendant. Accordingly, this matter is **DISMISSED WITH PREJUDICE.**

### I.    PROCEDURAL BACKGROUND

On May 23, 2012, Ms. Nunley initially filed J.M.'s application for Disability Insurance Benefits ("DIB"), alleging disability due to developmental delay, expressive language disorder, and pica with an onset date of August 1, 2009. R. 156-57.[2] Her application was initially denied

---

[1] This case was originally filed against Carolyn W. Colvin, the then-Acting Commissioner of Social Security. Nancy A. Berryhill is now the Acting Commissioner and, accordingly, has been substituted as the defendant in this suit pursuant to Fed. R. Civ. P. 25(d) ("The officer's successor is automatically substituted as a party."). See also 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

[2] "R." refers to the certified administrative record that was filed under seal on December 30, 2015, pursuant to Local

on November 9, 2012, id. at 90–94, and again denied upon reconsideration on July 2, 2013, id. at 97–105. Ms. Nunley then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on March 26, 2014. Id. at 38–66. The ALJ, Judge Alfred J. Costanzo, issued a decision denying Ms. Nunley's DIB application for J.M. on May 5, 2014. Id. at 10–30. In the decision, the ALJ concluded that J.M. has not been disabled, as defined in the Social Security Act, since May 23, 2012, the date the application was filed. R. 27. On May 5, 2014, Ms. Nunley filed a request with the Appeals Council to reconsider Judge Costanzo's decision. Id. at 1. On August 28, 2015, the Appeals Council denied Ms. Nunley's request for review because the ALJ's decision was supported by substantial evidence and Plaintiff's claims did not warrant review, making the ALJ's decision the Commissioner's final decision. Id. at 1–6.

Having exhausted her administrative remedies, Ms. Nunley filed the instant complaint for judicial review, pursuant to 42 U.S.C. § 405(g), of the Acting Commissioner's decision on October 29, 2015. ECF No. 3. The Acting Commissioner filed an Answer on December 30, 2015. ECF No. 8.

On January 6, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B), the matter was referred to U.S. Magistrate Judge Lawrence R. Leonard. ECF No. 10. Ms. Nunley filed her Motion for Summary Judgment on February 11, 2016, ECF No. 12, and the Acting Commissioner filed a Cross-Motion for Summary Judgment and a Memorandum in Support on March 11, 2016, ECF Nos. 13 and 14. On May 6, 2016, Ms. Nunley filed a reply brief in support of her own motion for summary judgment and in opposition to the Acting Commissioner's motion. ECF No. 19.

On December 22, 2016, Magistrate Judge Leonard issued his R&R, which recommended that the Court deny Ms. Nunley's Motion for Summary Judgment, grant the Defendant's Motion for Summary Judgment, and affirm the Acting Commissioner's final decision. ECF No. 23. On

Civil Rules 5(B) and 7(C)(1).

2

January 13, 2017, Ms. Nunley filed a Motion for Extension of Time, ECF No. 24, requesting an extension of time to submit written objections to the R&R. ECF No. 23. On January 17, 2017, the Court granted the Motion and ordered that Ms. Nunley file any written objections by January 24, 2017.[3] ECF No. 25. On January 23, 2016, Ms. Nunley timely filed and served on Defendant her Objection. ECF No. 26. Defendant did not timely file a Response.[4] ECF No. 27.

## II.    FACTUAL BACKGROUND

### A.    J.M.'s BACKGROUND

In her application, Ms. Nunley alleged J.M.'s disability onset date was August 1, 2009. R. 156–57. J.M. was in kindergarten at the time of filing and had undergone occupational and speech therapy for her developmental delay, expressive language disorder, and pica. Id. at 157, 159. At the administrative hearing on March 26, 2014, Ms. Nunley was the sole witness, id. at 39, where she provided the following testimony:

Ms. Nunley testified that J.M. was in the first grade and lived with her in an apartment. Id. at 42–44. J.M. has a sister in kindergarten who does not live with them and Ms. Nunley has never been married and does not receive child support. Id. at 43. J.M. had an academic Individualized Education Program ("IEP") to help with her difficulties in writing, science, math,

---

[3] In the Report and Recommendation, Judge Leonard notes that, by receiving a copy of the Report and Recommendation, the parties were notified that either party would be able to serve on the other and file with the Clerk of the Court "specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation [was] mailed to the objecting party, see 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure 6(d)." Id. at 20. The receiving party would then have fourteen days to respond to the written objections. Id. Finally, the Report and Recommendation noted that "[t]he parties are further notified that failure to file timely specific written objections to the above findings and recommendation [would] result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations." Id.
  The Report and Recommendation was mailed to Plaintiff on December 23, 2016. ECF No. 23. This means that the seventeen day period—fourteen days per Federal Rule of Civil Procedure 72(b), with three extra days permitted by Federal Rule of Civil Procedure 6(d) for receipt by mail—for Plaintiff to file any objections expired on January 9, 2017.
[4] Defendant had fourteen days, per Judge Leonard's R&R, to respond to the written objection. Defendant filed the response on February 7, 2017, fifteen days after service of Plaintiff's objection. ECF No. 27.

and reading comprehension. Id. at 45-46. Ms. Nunley said J.M. received mostly Ds and Cs in school, and that J.M.'s school would allow her to decide whether her daughter would repeat the first grade. Id. In addition, J.M. had good attendance at school and did not have any behavior problems. Id. at 45, 47. She had friends in school and in her neighborhood, and she also participated in Girl Scouts, which she enjoyed. Id. at 47.

Moreover, Ms. Nunley testified J.M.'s biggest difficulty was handling her frustration. Id. at 48–50. She also said J.M. has an expressive speech disorder that inhibits her from answering open-ended questions, retelling stories, and being understood by people not familiar with her. Id. at 51-52. Ms. Nunley stated J.M. does not take any medication and has not experienced any health problems related to her sickle cell. Id. at 52–54. J.M. received occupational and speech therapy in school and additional speech therapy once a week outside of school. Id. at 57. J.M. did not suffer from any physical problems and can run, walk, feed herself, cut with scissors, bathe, and dress herself. Id. at 57–59. J.M. experienced some incontinence problems while at school, but her IEP allowed her to use the bathroom whenever she needed. Id. at 61.

According to J.M.'s school records, an IEP from May 31, 2012, revealed that she had mastered 50% of her IEP goals, could speak in complete sentences, identify colors, letters, and numbers up to ten, recognize family members, and follow the classroom routine. Id. at 192–93. The IEP stated she had difficulty following multiple step directions and "answering yes/no and "wh[-]" questions on a consistent basis." Id. at 193. Additionally, the IEP provided J.M.'s "overall language skills have improved," but that she "continues to have receptive and expressive language delays in the areas of vocabulary, responding to question, sentence structure, and sequencing skills" and "also delays in the area of pragmatic language skills." Id. at 194. However, J.M. does not have difficulty with her social/emotional functioning, motor and/or daily

living skills, work habits/ work adjustment skills, home/independent living, or community participation. Id. Ultimately, the IEP concluded J.M. has a sensory integration disorder and that she would be placed in an inclusion kindergarten classroom and receive 600 minutes of Specially Designated Instruction and sixty minutes of speech therapy every week. Id. at 195.

J.M.'s special education teacher and her kindergarten teacher completed a teacher questionnaire on April 9, 2013. Id. at 182–89. They noted that in the category of acquiring and using information, she had serious problems in eight of the ten indicators and obvious problems in the other two. Id. at 183. In the category of attending and completing tasks, J.M. had serious problems in seven of the thirteen indicators, obvious problems in two, slight problems in two, and no problems in two. Id. at 184. Further, in the category of interacting and relating with others, J.M. demonstrated obvious problems in four of the thirteen indicators, slight problems in one, and no problems in the remaining seven. Id. at 185. The teachers indicated that they could understand almost all of J.M.'s speech "after repetition and/or rephrasing." Id. at 186. In the category of moving about and manipulating objects, they noted J.M. had obvious problems in three of the seven categories, slight problems in two of them, and no problems in the other two. Id. The teachers wrote that J.M. "usually manages well, but seems to fall/trip more than average" and that she receives occupational therapy for handwriting and cutting. Id. In the category of caring for herself, the teachers said J.M. presented serious problems in four of the ten indicators, obvious problems in two, slight problems in one, and no problems in three. Id. at 187. In the section for medical conditions, the teachers wrote that J.M. has pica, eczema, and sickle cell anemia but they have "not impacted function in the classroom." Id. at 188.

On January 14, 2014, J.M. underwent an IEP classification assessment. Id. at 206. She was in the 37th percentile for nonverbal cognitive ability, the 82nd percentile for academic skills,

the 77th percentile for brief reading skills, the 65th percentile for math calculation skills, and the 70th percentile for brief writing skills. Id. Overall, her scores were considered in the "range from high average to above average." Id. The IEP report stated J.M. had a "supportive home environment," but that she "demonstrates severe language difficulties which limit her communication" and "shows characteristics of Autism." Id. at 207.

J.M.'s first grade teacher completed a teacher questionnaire on February 7, 2014. Id. at 216–27. The teacher wrote that J.M. was on grade level for reading, but below grade level for math and writing. Id. at 216. The teacher noted that in the category of acquiring and using information, J.M. had very serious problems in three of the ten indicators, serious problems in five of them, and slight problems in two. Id. at 217. In the category of attending and completing tasks, J.M. had very serious problems in six of the thirteen indicators, serious problems in one, obvious problems in three, and slight problems in three. Id. at 218. In the category of interacting and relating with others, J.M. demonstrated serious problems in four of the thirteen indicators, obvious problems in three, and slight problems in six. Id. at 219. J.M.'s teacher said she could not understand more than half of J.M.'s speech after repetition and/or rephrasing. Id. at 220. In the category of moving about and manipulating objects, she noted J.M. had obvious problems in two of the seven categories and slight problems in five of them. Id. In the category of caring for herself, J.M.'s teacher said J.M. presented serious problems in six of the ten indicators, obvious problems in one, and slight problems in three. Id. at 221. In the final section for medical conditions, J.M.'s teacher noted J.M. "experienced incontinence throughout the first semester of school, but has not had any problems lately." Id. at 222.

J.M.'s update to her IEP placement on February 27, 2014, stated that she is "using a functional pencil grasp when writing" and "has made good progress with letter and number

formation." Id. at 235. J.M. "is able to produce legible work with [minimal] verbal cues for spacing and line orientation," but she "often requires moderate redirection throughout a treatment session to remain focused on the task and this affects her written work." Id. An instructional testing accommodation from the same date explained that J.M. "requires the use of a study carrel during testing to reduce stimuli and distractibility" and that she receives tests in a small group and is allowed to take "reasonable breaks . . . to minimize fatigue." Id. at 236. An IEP Team Meeting Summary on March 11, 2014, stated that J.M. was "on grade level and does not require goals and objectives in academic areas," but that she would receive sixty minutes per week of speech services and 120 minutes of occupational therapy services. Id. at 237.

Furthermore, J.M.'s medical records date back to June 28, 2012, when she underwent an occupational therapy evaluation that showed she "performed below age level across all testing" and that "[d]efinite issues were noted with (1) sensory processing . . . (2) sensory modulation . . . and (3) behavior and emotional responses." Id. at 259. After occupational therapy from July 2012 to September 2012, id. at 263–343, J.M. "made great progress across skill areas with improvement on both assessments." Id. at 342. J.M. "benefit[ed] well from modeling and appears to be a quick learner. No sensory deficits impacting function or performance at this time." Id.

On August 9, 2012, J.M. went through a speech language assessment after "parental concerns with expressive language" such as not speaking much at school or around new people. Id. at 280. The speech therapist concluded she had a "moderate-severe receptive and expressive language disorder" due to her "difficulty understanding concepts, age appropriate grammatical structures (pronouns, possessives and plurals) and negation." Id. at 282. J.M. was recommended to undergo speech therapy services for one hour per week for a year. Id. After six months of speech therapy, on February 28, 2013, J.M.'s progress note stated that that her "goals [were]

7

achieved for use of 4-5 word utterances and answering yes/no questions," and that she had made "[i]mprovements with present progressive verbs." Id. at 422. J.M.'s speech therapy ran until August 12, 2013. Id at 423–65.

J.M. presented for a social/behavioral evaluation on January 15, 2014. Id. at 471. The doctor found she "was able to focus for brief periods up to two-to-three minutes with one-to-one instruction" and "attended to examiner questions and instructions with intrusive prompting." Id. During the assessment, J.M. "was able to communicate using simple phrases, gestures, and physical movement" and "had a good understanding of 'no,' and 'yes' responses." Id. The doctor administered the Autism-Diagnostic Observation Schedule-Second Edition (ADOS-2) and found "[t]he results of this instrument indicate that [J.M.] shows behaviors consistent with the criteria for the autism spectrum cut-off score...with a low level of evidence of autism related symptoms." Id. at 472. Further, the doctor gave recommendations for J.M.'s learning style as well as accommodations for maintaining her attention in the classroom. Id. at 473.

J.M.'s treating physician wrote a letter on February 13, 2014, that stated he "met [J.M.] at age 18 months and at that time she was noted to have a language delay." Id. at 468. The physician noted that she had genetic testing at her three year visit that revealed she might have an autism spectrum disorder, but that he believed she needed to repeat the ADOS testing. Id. J.M.'s records from a doctor's visit on May 5, 2014, indicated she had repeated the ADOS testing and her results were "consistent with a diagnosis of autism spectrum disorder." Id. at 469. The doctor noted that J.M. "could stay in the inclusion classroom next year," but that she "may also benefit from a smaller self-contained classroom for special education." Id.

Lastly, J.M. underwent a psychological evaluation on November 1, 2012, at the request of the state agency. Id. at 302-04. The evaluation revealed that she had "no obvious motor

8

impairment . . . could sit, stand, walk, and maintain balance . . . was flexible . . . . Gait and posture were unremarkable . . . had an initially high activity level, but then was within normal limits after she calmed down . . . had no tics, mannerisms, or atypical motor behaviors as typically conceptualized . . . engaged in broadly repetitive gestures . . . [and] had some exaggerated physical gestures." Id. at 303. J.M. presented with "low average overall cognitive ability with better nonverbal than verbal skills" and "some features consistent with a mild pervasive developmental disorder," but that there was "improvement in her functioning level over time." Id. at 304.

Three state agency experts reviewed J.M.'s records on November 8, 2012, and found that although J.M. had "marked difficulties with speech, records show that she is continuing to improve all of the time" and that she "receives special education services for her speech and language impairment." Id. at 74. Additionally, they found that even though J.M. had a pervasive developmental delay, "her limitations...are not so severe as to be disabling." Id. Ultimately, the experts concluded J.M.'s "condition results in some limitations in the ability to function, but those limitations are not severe enough to be considered disabling" because it "does not cause marked and severe functional limitations." Id.

Ms. Nunley requested reconsideration of the state agency experts' decision, and subsequently three new state experts were selected to review J.M.'s records between June 26, 2013, and July 1, 2013. Id. at 82–88. The experts concluded J.M.'s "condition results in some limitation in the ability to function, but those limitations are not severe enough to be considered disabling" because "her condition does not cause marked and severe functional limitations." Id. at 86. The experts noted she "has a history of treatment for her conditions" and although she "has some difficulties with her speech, she is still able to communicate with others and most of her

speech can be understood without much difficulty." Id. Moreover, her pervasive developmental delay presents some limitations, but "they are not so severe as to be disabling" as "with continued treatment her condition should continue to improve." Id.

## B.   ALJ HEARING

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a three-step sequential analysis of childhood disability claims for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. Id. The ALJ "follow[s] a set order" to determine whether a child has a disability, by determining whether the child: (1) is working or doing substantial gainful activity since the impairment; (2) has a physical or mental impairment or combination of impairments that is severe; and (3) if the impairment "meets, medically equals, or functionally equals" a listed disability. 20 C.F.R. § 416.924(a).

An impairment of a child age three to eighteen meets or medically equals a listed impairment, if at least two of the following are present:

> a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P., app.1 § 112.02(B)(l)(d)(2).

Determining if a child functionally equals the listing under the third step requires evaluation of six domains of the child's limitation with: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for themselves; and (6) their health and physical well-being. 20 C.F.R. § 416.926a(b)(l). The ALJ can find an impairment functionally equals a listed disability if the child has an "extreme" limitation in one of the six domains or two "marked" limitations. 20 C.F.R. §416.92a(a). The ALJ can determine a limitation is "extreme" if the child's impairment "interferes very seriously with [their] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). Likewise, the ALJ can find a limitation is "marked" if the child's impairment "interferes seriously with [their] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that J.M. met the first two steps because she has not engaged in substantial activity since applying for DIB and her speech-language developmental delay is a severe impairment. R. 16. However, the ALJ concluded that J.M. did not meet step three, and is thus not disabled, because she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" and she "does not have an impairment or combination of impairments that functionally equals the

11

severity of the listings." Id. at 16-17.

Regarding the conclusion that J.M. did not meet or medically equal the severity of a listed impairment, the ALJ gave "significant weight to the State agency medical consultants' opinions." Id. at 16. The ALJ found that J.M. did not have "at least two of the following; marked impairment in age-appropriate cognitive/communicative function; marked impairment in age-appropriate social functioning; marked impairment in age-appropriate personal functioning; or marked difficulties in maintaining concentration, persistence or pace." Id. The ALJ noted that although J.M. "had low average overall cognitive ability" and "problems with inattention and distractibility," "she had "average nonverbal cognitive ability and very high academic skills," "friends in school and out of school," "does not appear to have significant behavioral problems," and "is on grade level academically." Id. at 16-17.

The ALJ found J.M. did not functionally equal the severity of a listed impairment because even though J.M.'s "medically determinable impairments could reasonably be expected to produce the alleged symptoms," "the statements concerning the intensity, persistence, and limiting effects of these symptoms are only partially credible." Id. at 18. Furthermore, the ALJ acknowledged that J.M. had a language disorder dating back to when she was eighteen months old and that the questionnaires from her kindergarten and first grade teachers revealed serious and obvious problems. Id. Ultimately, the ALJ did not find these concerns to support a "marked" finding in any of the six domains because in November 2012, J.M. was doing fine in school, and despite her diagnoses of a mild pervasive developmental disorder and a mild level of autism spectrum disorder, she was reading at grade level. Id. at 18–19. The ALJ gave "relatively little weight to the teacher questionnaires . . . as they seem to overstate [J.M.'s] functional limitations" since she has "good speech intelligibility for both familiar and novel listeners, normal

12

voice/fluency, and good articulation phonology, with some articulation errors" as well as the fact "[s]he continues to receive occupational therapy, but has made good progress, and although she reportedly has problems maintaining attention, she is on grade level academically." Id. at 19.

The ALJ also explained why he did not find that J.M. had "marked" limitation in any of the six domains. Id. at 19–27. First, the ALJ concluded J.M. had "less than marked limitation in acquiring and using information" because of the improvements she had made with speech therapy, her ability to follow directions, her good speech intelligibility, and that she is doing well academically. Id. at 20–21. The ALJ stated that the fact J.M. was reading at grade level was evidence against a "marked" limitation in this category "[c]onsidering the importance of reading in the overall educational process." Id. at 19. Secondly, the ALJ found that J.M.'s limitation with attending and completing tasks was less than "marked" because she is not taking any medication nor has she been diagnosed with attention-deficit disorder. Id. at 21–22. She "also likes routines and functions well with them, completes activities that she enjoys, and is on grade level despite her reported problems." Id. at 22. The ALJ found J.M. has less than "marked" limitation in the third category of interacting and relating with others because "she has friends in school and outside of school." Id. at 22–23. This, along with the fact that she also "interacts with others in Girl Scouts" and enjoys the activities, counteracted the teacher questionnaires. Id. at 22–23.

Fourth, the ALJ decided J.M. did not have any limitation in moving about and manipulating objects based on her November 2012 examination, her most recent IEP, and her mother's testimony at the hearing. Id. at 23–25. Fifth, the ALJ concluded J.M. did not have "marked" limitation in the ability to care for herself given her November 2012 examination and her mother's testimony. Id. at 25–26. Lastly, the ALJ found that J.M. did not have any limitation in health and physical well-being as her kindergarten teacher said that her pica, eczema, and

sickle cell did not impact her ability in the classroom and her mother testified she did not have any health problems related to the sickle cell. Id. at 26–27.

### III.   STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, the Court reviews de novo any part of a Magistrate Judge's recommendation to which a party has properly objected. Fed. R. Civ. P. 72(b)(3). The Court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Id. The Court may reject perfunctory or rehashed objections to R&R's that amount to "a second opportunity to present the arguments already considered by the Magistrate-Judge." Gonzalez-Ramos v. Empresas Berrios, Inc., 360 F. Supp. 2d 373, 376 (D. Puerto Rico 2005); see Riddick v. Colvin, 2013 WL 1192984 *1 n.1 (E.D. Va., Mar. 21, 2013).

The determination of a childhood disability is a three-step inquiry, as discussed above in II.B. Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining (1) whether the decision was supported by substantial evidence in the record and (2) whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "If the Commissioner's decision is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the Court must reverse the decision." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). In deciding whether to uphold the Commissioner's final decision, the Court considers the entire record, "including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" Meyer v. Astrue, 662 F.3d 700, 704 (4th Cir. 2011) (quoting Wilkins v. Sec'y, Dept. of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).

Substantial evidence is "evidence which a reasoning mind would accept as sufficient to

support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). See also Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) ("In performing its review, the court does not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." (internal citations and quotations omitted)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." Hancock, 667 F.3d at 472 (internal citations and quotations omitted). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. Hays, 907 F.2d at 1456.

## IV.   ANALYSIS

Ms. Nunley contends that the Magistrate Judge made one error: that the R&R erred in concluding that "the ALJ found that J.M.'s limitation with attending and completing tasks"—the second domain—"was less than 'marked' because she is not taking any medication . . . ." ECF No. 26. See also ECF No. 23, at 12. First, Ms. Nunley argues that this is "not factual information" as J.M. currently requires at least two medications. ECF No. 26. Second, Ms. Nunley further argues that "J.M.'s ability to follow directions does not go beyond two step directions, and those findings have been found in the previous documents submitted. The Vanderbilt test data show this information in its entirety." Id. Ms. Nunley then asks that the "information should be tak[en] into consideration being that the facts presented . . . [are] incorrect." Id.

With respect to Ms. Nunley's first contention, Ms. Nunley advises that J.M. has been prescribed methylphenidate and desmopressin to address J.M.'s diagnoses of "Nocturnal Enuresis, Autistic Disorder, and Attention [D]eficit [H]yperactivity [D]isorder." ECF No. 26. In support of this, Ms. Nunley attaches a January 23, 2017 e-mail from a primary care coordinator at Children's Hospital of the King's Daughters listing these diagnoses and medications for J.M. Id. Ms. Nunley further advises that these diagnoses and medications will "continue to affect [J.M.] for the rest of her life" as "[s]he will always need someone to monitor her" by "[ensuring] she is taking her medication so that she[] can function throughout the day." Id.

With respect to the January 23, 2017 email, 42 U.S.C. § 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing . . . . The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

Babcock v. Commissioner of Social Sec., 2011 WL 2899169, at *6 (E.D. Va., 2011) further provides:

> A district court reviewing an ALJ's decision cannot consider evidence outside the record in front of the ALJ. Smith v. Chater, 99 F.3d 635, 638 n. 5 (4th Cir.1996). A district court can order evidence presented to the Commissioner on remand if (1) the evidence is relevant to the determination of disability at the time the application was filed, (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him, (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner, and (4) the claimant makes a general showing of the new evidence to the reviewing court. 42 U.S.C. § 405(g); Borders v. Heckler, 777 F.2d 954, 955 (4th Cir.1985). See Miller v. Barnhart, 64 Fed. App'x 858, 859–60 (4th Cir.2003).

In reiterating these standards, the Fourth Circuit concluded: "In assessing whether the claimant has made these requisite showings, however, this Court does not find facts or try the case de novo." Finney v. Colvin, 637 Fed. App'x 711, 715–16 (4th Cir. 2016) (internal citations and

quotations omitted).

The burden of showing that they are met rests with the claimant. See Fagg v. Chater, 1997 WL 39146, at *2 (4th Cir. Feb. 3, 1997); Keith v. Astrue, 2012 WL 2425658, at *2 (W.D. Va. 22 Jun. 2012) ("The burden of demonstrating that all of the Sentence Six requirements have been met rests with the plaintiff."). See also Hayes v. Colvin, 2016 WL 4257191, at *4 (E.D.N.C. 2016).

As this e-mail was not in the record before the ALJ, the Court construes Ms. Nunley's submission of additional evidence as a request for a remand of the 2014 decision in light of the supplemental information provided. Upon review, it does not appear to this Court that Ms. Nunley has demonstrated a fulfillment of all four requirements necessary for remand based upon additional evidence. First, the information fails to meet the requirement that it relate to the period of disability in issue, which is the period between the date of application for benefits through the date of the ALJ's decision. 20 C.F.R. § 416.330. The e-mail Ms. Nunley has submitted as documentation of J.M.'s medication intake is dated January 23, 2017. However, the period of disability in issue is between May 23, 2012, when Ms. Nunley originally filed her daughter's application, and May 5, 2014, when Judge Costanza issued his decision. 20 C.F.R. § 416.924(a). See also R. 27. No further indication of when the diagnoses were made or when the medications were prescribed is included in the email.

Second, Ms. Nunley has not demonstrated that Judge Costanza's decision would have been different had he known of the e-mail listing the diagnoses and prescriptions. Judge Leonard's review of the record found that "there was sufficient evidence to support the ALJ's finding for the second domain that J.M.'s limitation with attending and completing tasks was less than 'marked'" not only because of Ms. Nunley's testimony that J.M. was not taking any

17

medication and had not been diagnosed with attention-deficit disorder, ECF No. 23, at 18, <u>see</u> <u>also</u> R. 52–54, 222, but also because J.M.'s first IEP stated she had mastered following the classroom routine, mastered completing the tasks associated with the routine, and demonstrated an ability to stay on grade level (and, accordingly, attend and complete tasks associated with her education), ECF No. 23, at 18, <u>see also</u> R. 193, 237.

Third, Ms. Nunley failed to demonstrate good cause as to why this information was not presented earlier. Finally, fourth, Ms. Nunley has presented to the reviewing court at least a general showing of the nature of the new evidence. However, Ms. Nunley's failure to fulfill the other three requirements means that the Court cannot consider the new evidence outside the record before the ALJ and remand to the Commissioner on the basis of the new evidence.

With respect to the information previously in the record, even if this Court were to consider the previous documents submitted that demonstrate J.M.'s ability to follow directions does not go beyond two-step directions, such findings were, per Ms. Nunley's Objection, contained in the previous record and, accordingly, considered by the ALJ and the R&R. <u>See, e.g.,</u> R. 394, 415, 437, 469. Furthermore, the R&R also takes note of the teacher questionnaire that notes that, with respect to attending and completing tasks, J.M. "had very serious problems in six of the thirteen indicators, serious problems in one, obvious problems in three, and slight problems in three." ECF No. 23, at 5–6. <u>See also</u> R. 218. Nonetheless, as stated above, Judge Leonard's review of the record found that "there was sufficient evidence to support the ALJ's finding for the second domain that J.M.'s limitation with attending and completing tasks was less than 'marked.'" ECF No. 23, at 18. Judge Leonard reached this conclusion after assessing the ALJ's consideration of a number of pieces of evidence, including J.M.'s then-lack of diagnosis and medication, her mastery of the classroom routine, and her ability to stay on grade level. <u>Id.</u>

"In performing its review, the court does not undertake to reweigh conflicting evidence[.]" Hancock, 667 F.3d at 472. Having considered this objection de novo, the Court concludes that substantial evidence supports the ALJ's finding that J.M.'s limitation with attending and completing tasks was less than "marked" and, accordingly, rejects it. ECF No. 26.

20 C.F.R. § 416.330(b) provides: "If [an applicant] first meet[s] all the requirements for eligibility after the period for which [the] application was in effect, [the applicant] must file a new application for benefits." Accordingly, Ms. Nunley's remedy—should she believe the evidence concerning J.M.'s diagnoses and medication as presented in her Objection would qualify J.M. for a finding of a disability after the ALJ's 2014 decision—is to file a new application. See Goodshield v. Colvin, 2015 WL 5009243, at *13 n. 13 (D.S.C. Aug. 19, 2015) (denying plaintiff's request to consider new evidence because of her failure to explain why she previously failed to present the evidence to the ALJ, how the new evidence related back to the relevant time period, and how the new evidence required remand, but noting that plaintiff could file a new application for benefits if she believed her functional abilities to work had deteriorated since the ALJ's decision).

V.   **CONCLUSION**

Having reviewed Plaintiff's objection de novo, the Court: (1) **ACCEPTS** the R&R, ECF No. 23; (2) **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 12; (3) **GRANTS** the Defendant's Motion for Summary Judgment, ECF No. 13; and (4) **AFFIRMS** the final decision of the Defendant. Accordingly, this matter is **DISMISSED WITH PREJUDICE.**

The Clerk is **DIRECTED** to enter judgment in favor of the Defendant and to forward a copy of this Order to the pro se Plaintiff and Counsel of Record for the Defendant.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior/United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
February 13, 2017